All right, our next case is Smart Communications Holding Inc. v. Global Tel-Link, number 22-3287. And we're happy to hear from you, counsel. Thank you, your honor. May it please the court and good afternoon. My name is Phil Closius, and I represent the appellants to corporations that I would refer to as Smart Communications or simply SMART. At this point in time, I'd like to reserve three minutes for rebuttal. That's granted. Thank you. Your honors, I fear I'm also going to present you with an unusual case. This case, most of the black letter law is actually agreed to by the parties. The case really comes down to how you interpret the complaint and how you read its effect on the black letter law. Our position is pretty straightforward. The district court consistently misread the complaint. The opinion characterizes specific allegations as general and conclusory, and the opinion also adopts a factual scenario that's not supported by the complaint. This is particularly egregious in the context of a motion to dismiss when all benefit of the doubt should be going to the complaint and to the plaintiffs in the lower court. Your honors, with regards to our substantive sex Sherman One claim, again, the black letter law is pretty well in agreement from Meritor versus Eaton Corporation. Meritor states that exclusive contracts do not violate Sherman One, and it also states that if they're challenged, the rule of reason is appropriate, not the per se. Well, isn't Meritor different than this case? That was a long-term contract that basically locked up the market. I think in that case, it was 85% of the entire market was locked up by one contract. Here we're dealing with one contract in one prison. Is it really applicable? Yes, your honor, because we're going to argue that the one prison is the market, that the single entity of the prison is the market, and it's also applicable because Meritor is very specific that even though exclusive contracts do not violate the Sherman Act, they do if you add certain provisions to them. Meritor was clear that taking a two-year provision and turning it into a five-year provision was too long to be considered reasonable. It also said that the agreements have to be easily terminable, and if you add termination penalties to it, that's also suspect. Meritor finally said it's most suspect if those things are added to a previous pattern of contracts that did not include them, and that's exactly the case we have today, your honor. Is this like the host case, our prior opinion, where we dealt with an objectionable term in a contract and without more can't constitute an antitrust injury, which I think is what you're talking about right now. No, your honor. There's the host case which goes to antitrust injury, and I was speaking specifically to the section Sherman 1 substantive claim, but the host case does not apply. Our fact pattern is not that of a voluntary walk away from an agreement. In host, host was asking for dining concessions in Philadelphia airport. They thought they had an agreement. The airport said you got to serve Pepsi. They said we don't want to do it. The airport said you had to, and they walked away from the deal. That's not our case. In our case, we engaged in good faith negotiations with North County. We were told repeatedly that we had the contract, and then suddenly found out, and if you thought we were going to execute, that your county had executed a deal with GTL, and we were out of it. So that's a major distinction. We did not voluntarily walk away. We were excluded. The other major point of host, host is clear. Again, black letter law, nobody disagrees. Sherman 1 allegations have to be to competition, not just to competitor. In our complaint, we were clear that the deal that was offered was better. We offered a million, $2 million. The final deal they accepted was one. We offered 12 and a half cents per minute phone call. The final deal they accepted was 16 cents. So this, this argument is, I think, a very bold restraint of trade argument, because in this case, we recognize that there will be only one provider of telecommunication services to York County Prison. Your client wanted to be that one provider. Someone else, your opponent's client, is the one provider. And so no matter what, there's only going to be one provider. We're already in kind of a non-competitive space. You're buying for sole source. But in essence, what you're saying is that our injury is that we would have been, or the injury in this case is that we would have been a better monopolist. We would have been a more pro-competitive monopolist because our prices are cheaper. And if that were the case, this is just intuition. This isn't case law, right? But this is my like a lot. And so I would think that the losers would be coming in all the time on Sherman One claims saying we gave a better deal. We have antitrust injury. I see none of that. Yours would be the first case that I would ever see. You say at the outset, it's unusual facts. Yours would be a prototype Sherman One case where someone says, I was the better would-be monopolist. Please give me antitrust injury. Why should we reach that really, really, really novel, at least I think it's unprecedented, but you probably know antitrust a lot better than I do. Why should we reach that? Your Honor, if GTL and York prison had executed a new agreement for two years at will, like the prior 16 years of agreements have been, we would not be in this court and there would not be an antitrust violation. The antitrust laws are pretty clear that how you do something matters. And even though you're right, we want to be the good monopolist. I get it. But how you do it matters. They excluded other competitors for seven years in this agreement, where for 16 years of practice, it was only every two years. So under the 16 year prior practice, you would get your shot to go in bed every two years. But at the heart of it, all of your arguments rely on the market being defined as the York prison. Correct. Can I just ask a question on that? Because again, I'm asking someone with more antitrust knowledge, but what I understand is we're looking at who the purchases are, who the buyers are, when we want to define what the relevant market is for antitrust purposes. Correct. And so if I'm teasing through this, at one level, we could see that yes, York County prison is kind of entering a contract. And so that would be the prison, but then there's the inmates who are actually kind of using the services. But then the actual person, at least as I can understand it from the record, and it's not a huge record because you stood on your complaint, is that the inmates only make collect calls. So the people who actually are paying for this are not the inmates. If we want to trace this all the way down, the market is the people that the inmates call and ask to accept a collect call. They're the ones that are going to make the choices about how much does a collect call cost? It used to cost $5, now it costs $4, now it costs $7. And so why isn't the relevant market kind of, we can nationwide geographically, but at least the defining characteristic of it being the people who are actually making the economic decision, driving these contracts, the people who receive collect calls from inmates and then make the decision yes or no, because not everyone says yes. Correct, Ron. The important point in that is that your prison is not the buyer. I will concede to you that the collect call payers have a significant influence on who the buyers are. So why doesn't that define, so I guess, to just sharpen my question, why doesn't that define our analysis of the relevant market? If it does, it still brings you back to your county prison is the only spot that anybody has any choice in dealing with. That's why it should be the market. Even if you buy, it's the collect call recipients that are the market. It's still limited to your county prison and no one has a choice. They still have a choice whether or not they accept the call. The choice isn't whether they have a loved one incarcerated or not. That's not the market. The market is whether their loved one incarcerated calls them and ask them to pay for the call. If that's the choice, why isn't the market the recipients of the collect calls? It may be, your honor, if you want to see that. We think the inmates are the placeholder for those people. We think the inmates are the people that are initiating, call me and all that kind of stuff. That's how it has to happen. But I'll concede to you, the recipients of the collect call have to open up an account with GTL and they have to have a credit card linked to the account. That's just how this works. But we think the inmates stand for their family and friends. And again, back to host for a minute, that the complaint is clear. We alleged harm to the inmates. We alleged harm to the York County residents and we alleged harm to other providers. And the district court simply said, that's, I believe her quote was, it's illusory. How can you draw that conclusion from very specific complaints of three different groups that were harmed? I see your time is limited. So could I turn you towards your state law claims? Sure. In determining that the alleged defamatory statements were conclusory or not sufficient to support an action and defamation, do you agree that the opinion portions of those have to be and only the fact-based portions, the factual portions would be actionable? I must. Actual statements can be defamatory. Opinions can be defamatory if they lead to a reasonable interpretation of a set of facts that are false. So it's not simply, is it fact or is it opinion? There are some statements of opinion that can be treated as fact, if it's a reasonable interpretation that they are pointing to facts that are in fact not true. And in looking at the three that were pled, I think on page 18 of the complaint and then reiterated in sort of summary fashion throughout the complaint, those appear to have both opinion or prediction and fact. Is it your position that those opinion slash predictions implicitly or implied the existence of other facts, or are you just saying the factual portions themselves were false? Your Honor, there are certainly some opinions mixed in, but if you look at paragraph 77, where the warden confirmed what happened in this secret meeting where the defamatory things take place. For example, the attorneys at Stern Kessler for GTL said that Smart did not have the financial ability to fulfill the contract. That's just not true. I don't think that's an opinion. I think that's a statement that either is a fact or that leads to reasonable facts that will turn out not to be true. They also said that they were going to come in and if Smart got the equipment and no one would be able to use the phones. I don't think that's an opinion. I think that's a fact. I think it was intended to intimidate your county into changing from our position, Smart, which they had essentially agreed to, to GTL. Well, aren't things such as what are needed or whether or not the installed equipment would be owned by Lattice or not predictions and or opinions? At the time the contract is not fulfilled, what resources are needed? Isn't that a future prediction? They made the statement that they have a judgment against Lattice, a company that was acquired by Smart, that they would then try to enforce by seizing Smart's equipment. As far as we know, that's just not true. As far as you know, what's not true? That they have a judgment against Lattice that would entitle them to take Smart's equipment. Smart's equipment that used to be Lattice's? No. They said that they had a judgment against Lattice and in order to enforce the judgment, they would seize Smart's equipment. A substitution? This is what they said, Your Honor. I'm just trying to parse out what is the smart. So I guess they have some theory that because they think they have a claim against Lattice, that would enable them to see Smart's equipment, which would mean that the prison would be in chaos because they couldn't have a phone service. Your Honor, thank you. I may please the court. Good afternoon. My name is Brian Feeney from Greenberg Trari. I'm appearing here today on behalf of Global Telling. Mr. Scheinbold and I have agreed that I'll take nine minutes and he'll take six. The court should affirm the dismissal of the Sherman Act claim for two separate reasons. First, Smart did not allege that it suffered an antitrust injury and thus it lacks antitrust standing. And second, Smart did not plead a cognizable relevant market. There's no antitrust injury here. And I think the clearest explanation or example of that is the law is that an antitrust plaintiff has to establish, prove, plead that it established an antitrust injury. And Smart's response to that is, you know, others were injured. The inmates were injured. The inmates' families were injured. York paid more money. There's no allegation of an antitrust injury that Smart incurred. Smart's only injury really is that it engaged in a contract negotiation. And at the end of the day, it did not secure the contract. And the law is clear that, you know, if you get in there and you're able to compete and you don't win the exclusive contract, you don't incur antitrust injury. The Host case further demonstrates Smart's lack of antitrust injury. First, this court in Host found that no antitrust injury arose where the plaintiff's harm was incurred due to negotiations not resulting in a contract. My opponent, my adversary, made the point that, you know, there's a distinction to be drawn from walking away from the contract versus, you know, being told that you're not going to win the contract. But really, that is not an important or relevant distinction. In both cases, your colleague also said that there's a difference because we should look at kind of past practices. And that's not necessarily part of Host in terms of what the past history is. And he's saying that there's just this pattern of two years, two years, two years, seven years. So doesn't that begin to show that there's something a little more, you know, anti-competitive if you're not going to rebid this for, you know, three and a half times as long? Doesn't that kind of show that, hey, look, we might be mostly a competitor, and competitor injury is not enough. But when you extend it quite this long, which it just stands to reason that some consumer, whoever that is, I'm inclined to think it's inmates, families, but some consumer is going to be harmed. Well, well, you know, the meritorious case, you know, speaks to that. And it says that, you know, increasing the contract duration of five years can be anti-competitive, but it has to be paired with market domination. In other words, you know, just one contract that is a sliver of the overall market like we have here, you know, the length of the contract is not relevant. What's relevant where the length of the contract becomes important is if it's used to exclude others from the market in general. And as the Chief Judge pointed out here in the meritorious case, 85% of the market was sucked up by Eaton going out and entering into long-term exclusive contracts with, I think, the five only direct purchasers in North America. And therefore, you know, the length of the contract here does not suggest... So, but if the market is actually just York County prison, if that's the market, then this three and a half timesing it does suggest that we're in that space of market domination coupled with prolonged grant longer than was, longer percentage-wise, longer year-wise than was at issue in meritorious. So it strikes me that this notion of injury sooner or later, we're just going to have to define market before we can really account for injury. Right. And so why is the market something other than York County prison? Well, there's actually a third circuit case that is directly on point on that. It's the Laurel Heart and Lung case that we briefed. And in that case, there were a group of doctors who entered into an exclusive agreement with a hospital and the plaintiff with a competing hospital. It alleged that the agreement resulted in harm to competition because it forced consumers to have their procedures at one and not the other. I know, that's not... I mean, I get it. I read your briefing on it and the entire time I was reading it, I was like, the consumers can still pick. I mean, the prison is truly is captive and audiences you're going to get. And so there, I just thought that I get it. You had something, you had some restraint there, no doubt. But I think it was a different restraint in terms of degree, right? Because no one was in prison. Right. Well, again, I don't think that rises to the level of an antitrust issue. I mean, it really is just a function of these are exclusive contracts. We all agree that they are appropriate as exclusive contracts. And it's York's decision whether it wants to go with the terms that GTL proposed or the terms that Smart proposed. So it's really... And this is a point that was touched on in Host, that parties are free to contract with each other. And like I said, the relevant market, I believe, if you read the Debora Heart and Lung case and other cases, is not the prison. The relevant market is the general market for ICS, for inmate calling services. I mean, but shouldn't we look, I mean, at least from the case law I read, and it does seem, your opponent seems to be right, that a lot of people agree on the black letter, at least the Supreme Court black letter antitrust law, applying it's really hard. But it seems that we should look when we define the market at who the purchasers are, who the buyers are. It seems to be almost a consumer centric kind of vision of antitrust at times. And so if we do that, it strikes me that the biggest commonality that anyone that's going to be buying these services is still linked to York County Prison. Either they're linked to trying to reach and communicate with an inmate at the prison. This isn't the service that they're looking to purchase for nationwide calling or roaming calling or to call somebody else. No matter how you cut it, it strikes me that the reason for this telecommunication services has to come back to a captive audience at York County Prison. Um, the response I'll make to that is, you know, the cases say that in looking to the market, yes, they use the term buyer and purchaser. But they also say they say commercial, you know, what are the commercial realities? Where does the, you know, where do those who need services look to acquire those services? So I think I think we're getting too hung up on, you know, it's somebody who's laying the money out. That's not really the issue. The reality of this market is that prisons go into the market, prisons need ICS services, they go into the market, and they, you know, look at what is out there and they make their choice. That's the market we're talking about. And that's the market that, you know, SMART and GTL compete with each other in. So, but if the prison makes a choice that really harms everyone who's paying for the services, right, it's totally anti-competitive for that. Don't we at least get to the point that we've got an alleged antitrust injury? I mean, we're trying to, you know, this case comes to us very early on. It's a complaint that they stood on. So I mean, that may be right at the end of the day, we can get into rule of reason, we can do all these other great things later. But at least for today, right? If it all comes back to the prison, why isn't that the relevant market? And why doesn't that define the nature of the injury? If everyone's going to pay more? Well, it certainly doesn't define the nature of SMART's injury. I mean, it's... No, it doesn't. Totally true. And that is the focus, right? The focus has got to be, you know, what is SMART's injury? Is that the sort of injury that the antitrust laws provide a remedy for? And here, you know, competing and losing the competition, the case law is clear that that's not an antitrust injury. Does it matter that the price paid by whoever's paying was actually less than the new contract? I mean, again, I think that's just a function of York's choice. York is the counterparty to GTL. There were a number of considerations. You know, there was the other lawsuit that was the fact that the prices actually went down and must have been more competitive. Oh, you're referring to GTLs bringing their price down in the face of country? Of course. It shows there was a competitive process. And, you know, there's the race tires case that says, you know, where competitors compete, one wins, one loses, you know, there's no antitrust injury. There's actually a learned hand quote that's in some of the cases, I'm not going to get it right. But it's basically, you know, where there's a competition, and the loser loses, the loser cannot come back against the winner, something along those lines, and it's in, it's in the cases. And I think that really sums up what this case is about. And, and why this court should affirm. Can I ask you one other area to the state court claims, and in particular, the defamation claim? Did the district court tell us which element specifically of defamation was lacking? Well, it wasn't, it wasn't a defamation claim, it was, it was a was a tortious interference claim. And there's a, there's a competitor's privilege that the restatement recognizes. Yes. And one way to get around that is to claim wrongful conduct and wrongful in the cases. So I jumped to defamation. Right. So I think what the court focused on, I think it's pretty clear what the conclusory allegations were that these, these statements, these alleged statements are false. Right. And there was no other false without pleading facts to establish the falsity of the statements. I think that they don't have to prove the falsity in their complaint. Well, that's an interesting question. I understand that truth is a defense to defamation. But is that true? When we're talking about a tortuous interference claim doesn't the plaintiff I, we actually looked at that question, I didn't see any case law on that. But I do think it's not the same question as, you know, defamation, I think, I think, because it's a it's a tortious interference claim, perhaps the plaintiff should have the burden to prove, you know, that there was no privilege and approve that you have to prove to have any analogous case. Again, we looked at that just an issue that I that occurred to me, and I didn't see any case law either way on that point. But, but, but I'm not sure that. But typically, under Pennsylvania defamation law, alleging something is false, as a factual matter, not in a matter of opinion is sufficient. I think I mean, for Pennsylvania law, I think it's a matter of I think it's a matter of the federal rules and pleading and Twombly. And I you know, I think you can't just say, oh, they're false, assuming they have the burden to prove that you can't just say, oh, those statements are false, you've got to you've got to allege facts that establish falsity. You know, let's say, you know, that, you know, they can allege that that the GTL did not have this judgment, or, you know, you know, we did, whatever it is, but, you know, plead facts that establish the falsity of the statements. If hypothetically, if we agreed with you on the antitrust point, but disagreed with you on the state law claims, I saw there's an allegation of diversity jurisdiction, it's still in state court, then right? Federal Court, I'm sorry, federal, it would still be a federal court to resolve the state court claims, right? Yes, Your Honor, I believe so. All right.  May it please the court, Adam Scheinbold for the York County defendants. I want to touch on a couple of points that were asked by the panel and were referred to by my colleague. The first was this question that Judge Chigaris, you asked about the reduction in price. That's part of the total analysis. And it's an important part of the total analysis, because it goes to the question of whether the conduct of GTL and York could be considered a First, we had an existing incumbent provider whose contract was up for renewal. We have a competitor who entered into negotiations with York County. Then we have further negotiations, parallel negotiations with the incumbent, resulting in a different deal, a different deal, both on the price per minute and the revenue that would be generated for York County. But what's overlooked repeatedly by SMART's analysis is what it pleaded in the complaint. SMART pleaded that it was in negotiating this during settlement negotiations with the county over the unrelated patent litigation. In other words, a benefit accruing to York County of contracting with SMART was the termination of patent litigation. Correspondingly, a benefit that was obtained by York County in contracting with GTL was indemnity for the patent litigation and the cost of defense. Either way, there was a different benefit that was independent of and valued differently from the cost per minute of collect calling by York County prisoners. York County clearly and unequivocally was a buyer of services, whether it was buying peace with SMART or whether it was buying indemnity from GTL. It was clearly a buyer in these contracts, and that point is repeatedly overlooked by SMART when it argues that York is not a buyer here. Secondly- Does that also distinguish it from the two-year cycles? That's an excellent question, Judge Chung, and the reason that it doesn't have anything to do with that, I say that as a matter of law. On the record, this argument that there was never a long-term contract is also false. SMART pleaded in its complaint at paragraph 22, appendix, uh, reproduce record page 074. On November 17, 2003, York County and TCG, the predecessor in interest, entered into an exclusive dealing inmate calling system agreement. GTL later became the assignee. The following paragraph, 23, on or about May 13, 2009, 2003 to 2009, the ICP agreement was amended in a first amendment. There was a practice of having a long-term contract in excess of five years. That long-term contract that was in excess of five years was subsequently amended a number of times. All of the subsequent amendments happened to be one- or two-year extensions, but the original contract, the original exclusive dealing contract was longer than five years. It is not out of the line of, out of the practice of these parties to have a long-term contract. And so, I don't know if this is in the pleadings or not, but when you say it was extended, it was extended at roughly the same price, quality, uh, values, et cetera, and then when they went and renegotiated long-term, price changed pretty radically. Is that or do we know? I can't say that. We don't know from the record. Yeah. Your Honor, I know that the, the exclusive contract was extended. That's what's pleaded. And that's, that's undeniably the case. That's in the public records of York County. As to what each individual contract provided, there's nothing in the record to give, to give the court a basis to say that one was a better negotiated deal versus the other. Now, the court also made a point of questioning who is the buyer here with respect to the inmates, as opposed to the family members. SMART has repeatedly argued to this court that the inmates of the buyers, as the court correctly pointed out, and as SMART pleaded in its complaint, all the calls are collect calls. So, the buyers are, to the extent that there's a payer, that somebody is paying for the service on a per call basis. It's actually, it's their families, their attorneys, right? It's families, it's attorneys, it's friends, it's whomever they choose to call and whoever accepts the collect call. SMART relied on a case called Delor. It was a Kentucky case about, that had a similar allegation, where the plaintiffs were, in fact, those third-party recipients of the collect calls. It's important to recognize that, that although that case was allowed to survive 12B6 practice, number one, it did so under Conley, not under Twombly. And number two, it did so with the very pointed observation by the court, that it sincerely doubted that there was a relevant market there, but that it concluded under the, any conceivable set of facts standard of Conley, that it couldn't dismiss at the 12B6 stage. So, the only case that was presented by SMART to give any support for the concept of a single prison as a relevant market for an antitrust, Sherman Act section one claim, is Delor, which said, I can't dismiss it under binding Supreme Court precedent, giving me how I have to interpret a complaint, but ain't no way this passes a plausibility test. And we subsequently have Twombly, which I will remind the court, and I had to remind myself as getting ready, is an antitrust case. Twombly said, you don't have to use your imagination to find the combination that's required under section one. They have to show it. They have to plead it. And they didn't here. I see my time is up. So, if the panel has any other questions, I will. Thank you, counsel. Thank you. And we'll hear rebuttal. Thank you, your honor. My colleague, the representative of GTL, stated that SMART has no antitrust injury because you don't get antitrust injury from not getting a contract. It's 100% accurate. It's also 100% irrelevant. The damage comes from the extensions, not from not getting the contract. It's the same mischaracterization they presented to the district court and the same mischaracterization the district court bought to make an erroneous ruling. Co-counsel for York said that there were few two-year extensions in prior dealings. If you look at 117 paragraph in the complaint, it clearly says that there were 10 amendments on information belief. The first contract was five, and the other 11 were the two-year extensions I was referring to. Judge Phipps, Tamper Electric says if a party has no choice, that's the definition of the geographic market, reflecting exactly what you mentioned. We also want to be clear. The black letter law is that single-market geographic markets, single-ended geographic markets should be rare or exceptional or unique or unusual. There's no debating that. That comes from Deborah Hospital, their case. It comes from every case we know of. We're asking you to say that this context, the prison context where there's no choice, is the rare exceptional case. The case law to date does say in a hospital context, it should be a single entity if it's the only hospital in a county or if it offers unusual, unique services. That's what we're asking you to do. We're asking you to have a narrow holding that we fit the exception that every case we looked at essentially says it's rare, but if it's an exceptional, unusual business industry fact pattern, it should be accepted. Finally, all of this is in the context of a motion to dismiss. Co-counsel claimed that we had to prove the falsity in a complaint, in a motion to dismiss context. That's not our understanding. That's again with the district court. She tried the case in a context of a motion to dismiss. All we have to do is come up with plausible allegations that what we eventually claim is true. We don't have to prove anything at this stage in hearings. Their very language betrays the arguments they made to the district court that the district court adopted and therefore it was erroneous. Need you allege a fact that supports falsity? For instance, in fact, comma, there is no judgment. We did not say that, Yaronne. No, I know you didn't see that, but I'm asking, are you required to? Not at the motion to dismiss phase. Yaronne, we've had no discovery. No, I know what stage we're at. I'm asking you at this stage. At this stage, right. Need you to do that. Just like in defamation, Your Honor, we pled the who, the what, the where, the why. We pled everything that classic tort concepts say you have to plead. Are they true or false? Well, we'll find out in discovery as we move forward. For these reasons, we ask you to reverse the judgment of the district court. Send us back. Thank you. Thank you, counsel. We'll take this case under advisement. We thank counsel for their excellent briefing and argument today.